966 So.2d 471 (2007)
STATE of Florida, Appellant,
v.
Thomas Wayne PATTERSON, Appellee.
No. 2D06-1799.
District Court of Appeal of Florida, Second District.
October 12, 2007.
*472 Bill McCollum, Attorney General, Tallahassee, and Diana K. Bock, Assistant Attorney General, Tampa, for Appellant.
Frank D.L. Winstead of Winstead Law Offices, Land O'Lakes, for Appellee.
WALLACE, Judge.
The State appeals from an order granting Thomas Wayne Patterson's motion for postconviction relief on the ground of ineffective assistance of trial counsel. After an evidentiary hearing, the postconviction court set aside Mr. Patterson's conviction for second-degree murder and awarded him a new trial. Because we find that Mr. Patterson failed to establish either deficient performance by his trial counsel or that trial counsel's alleged omissions prejudiced the outcome of the trial, we reverse the postconviction court's order.

I. THE TRIAL AND THE DIRECT APPEAL
On August 8, 1997, James Dunn was shot to death in Pasco County. The State charged Mr. Patterson with the second-degree murder of Mr. Dunn. The case went to trial during the week of November 16, 1998. Mr. Michael Tewell of the Public Defender's office represented Mr. Patterson during the trial proceedings.
At trial, the evidence showed that Mr. Dunn lived in an isolated, rural area northeast of Dade City. He regularly sold illegal drugs. In the predawn hours of August 8, someone shot Mr. Dunn three times and left him to bleed to death outside his residence. The State relied in part on the testimony of David Wayne Long, generally known as "Boomer," to link Mr. Patterson to the shooting death of Mr. Dunn. Both Mr. Patterson and Boomer were present at the scene of the *473 shooting, and each man had a motive to harm Mr. Dunn.
On the day before the shooting occurred, Boomer had become very angry with Mr. Dunn. In addition to dealing drugs, Mr. Dunn was also a "shade tree mechanic." He had performed repairs on Boomer's truck. Mr. Dunn was holding the truck at his residence until Boomer paid him for the repair work. On the day preceding the shooting, Boomer had been at Mr. Dunn's residence and had tried to obtain the release of his truck without making payment. When Mr. Dunn refused to release the truck, Boomer became irate. Several witnesses testified that Boomer was drinking heavily that day and into the evening.
Later that evening, Boomer told Mr. Patterson  a longtime friend of Mr. Dunn  that Mr. Dunn had accused Mr. Patterson of being a "snitch" for law enforcement. According to another witness, James Waldrup, this information got Mr. Patterson "pretty well riled up." Mr. Patterson's mental state was likely affected by his use of methamphetamine over a period of several days preceding the shooting. Mr. Patterson's wife testified that he became quick to anger when he was using methamphetamine and that his temper became worse the longer he had been using the drug. Mr. Waldrup described Mr. Patterson as "blistered" and not himself.
In the early morning hours of August 8, Mr. Patterson and Boomer decided to drive to Mr. Dunn's residence to confront him about his alleged characterization of Mr. Patterson as a law enforcement snitch. Before departing, Mr. Patterson instructed Mr. Waldrup  in quite vulgar language  to inform Mr. Dunn that he and Boomer were on their way to do harm to Mr. Dunn. Mr. Waldrup took this threat so seriously that he drove to Mr. Dunn's residence. Mr. Waldrup warned Mr. Dunn and his girlfriend about Mr. Patterson's threat, and he recommended that they flee. Disregarding what would prove to be excellent advice, Mr. Dunn and his girlfriend refused to leave their isolated residence.
After Mr. Waldrup had departed, Mr. Patterson and Boomer arrived at Mr. Dunn's residence. They were accompanied by Timothy Strickland and Linda Gifford. Both Mr. Strickland and Ms. Gifford testified for the State at trial. Although there were several other people in the residence, Mr. Dunn, who was unarmed, came outside alone to meet Mr. Patterson and Boomer. Mr. Strickland got out of the car but stood beside it. Ms. Gifford remained sitting in the car. Mr. Patterson and Boomer both walked away from the car to meet Mr. Dunn and began to argue with him.
Boomer's trial testimony concerning what happened next was as follows: During the course of the argument, Mr. Patterson produced a .380 caliber pistol. Boomer asked Mr. Patterson to give him the pistol, and Mr. Patterson complied. Boomer took the pistol and aimed it at his own truck, but he did not fire. After watching Boomer's gesture, Mr. Patterson demanded the return of the pistol. Boomer handed the pistol back to Mr. Patterson, and Mr. Patterson fired one shot into the ground. Then, Mr. Patterson fired several more shots at Mr. Dunn.
Mr. Strickland testified that he saw Mr. Patterson fire the first shot into the ground. After the initial gunshot, Mr. Strickland immediately ducked for cover. For this reason, he heard but did not see Mr. Patterson fire the volley that followed. Ms. Gifford testified that she heard gunshots but that she did not see who pulled the trigger.
*474 After the gunshots were fired, all three men got back into the waiting car with Ms. Gifford. Mr. Strickland testified that as the foursome fled the scene in the car, he remarked, "You better hope he doesn't die." According to Mr. Strickland, Mr. Patterson responded, "He's not going to die; I just shot him in the legs."[1] Ms. Gifford's recollection of Mr. Patterson's response was hazy, but her testimony generally corroborated Mr. Strickland's testimony on this point. Both Mr. Strickland and Ms. Gifford also testified that they heard Boomer express the hope that Mr. Dunn would die.
During the foursome's ride away from the area, Boomer and Mr. Strickland  who were sitting in the back seat  disassembled the pistol that was used in the shooting and threw the parts out the car's windows. Several days later, with Boomer's help, sheriff's deputies recovered the barrel and another part of the pistol from the Gant Lake Canal in Sumter County. A firearms examiner testified that the two bullets[2] that were removed from Mr. Dunn's body were fired from the pistol's barrel.
The defense called four witnesses at trial. None of these witnesses had been present at the scene of the shooting. Ronald R. Bell, a toxicologist, was one of the defense witnesses.[3] Mr. Bell testified that a post-mortem drug screen demonstrated that Mr. Dunn was under the influence of methamphetamine at the time of his death. Mr. Patterson did not attempt to establish an alibi, and he did not take the stand in his own defense. In closing argument, Mr. Patterson's trial counsel suggested to the jury that the evidence supported the hypothesis that Boomer was the shooter, not Mr. Patterson.
The jury found Mr. Patterson to be guilty as charged. On November 19, 1998, the trial court adjudged Mr. Patterson to be guilty in accordance with the jury's verdict and sentenced him to life in prison. Mr. Patterson took a direct appeal, and this court affirmed his judgment and sentence. Patterson v. State, 744 So.2d 1001 (Fla. 2d DCA 1999) (table decision).

II. THE POSTCONVICTION PROCEEDINGS
A. The Motion
After his conviction was affirmed on direct appeal, Mr. Patterson filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. In his motion, Mr. Patterson alleged three claims of ineffective assistance of counsel. Patterson v. State, 845 So.2d 311, 311 (Fla. 2d DCA 2003). The third claim was based on the alleged omission of counsel to call witnesses at trial. Id. at 312. Mr. Patterson alleged that two State witnesses implicated him in the murder of Mr. Dunn, a neighborhood drug dealer. Id. Mr. Patterson claimed that his trial "counsel was ineffective for failing to investigate four other witnesses from the neighborhood and for failing to call them to testify at trial." Id. On appeal from the postconviction court's summary denial of the motion, this court held that the third ground of Mr. Patterson's *475 motion stated a facially sufficient claim for relief. Id. Accordingly, we reversed the summary denial of the motion's third claim and remanded for the postconviction court to either conduct an evidentiary hearing or to provide record attachments demonstrating that Mr. Patterson was not entitled to relief. Id.
B. The Evidentiary Hearing
On remand, the postconviction court chose to conduct an evidentiary hearing on Mr. Patterson's claim concerning trial counsel's alleged omission to call the four witnesses who had been identified in the motion. Mr. Patterson was represented by counsel at the hearing. However, postconviction counsel presented evidence concerning only one of the four potential witnesses  Charles Richard Spriggs. Both Mr. Patterson and Mr. Spriggs testified for the defense at the hearing. On the other hand, the State did not call any witnesses. Notably, neither the State nor Mr. Patterson called Mr. Tewell as a witness despite his appearance at the hearing in accordance with a subpoena.[4]
At the evidentiary hearing, Mr. Patterson argued that Mr. Spriggs' testimony would have refuted  at least in part  Boomer's account of the killing. In addition, Mr. Patterson claimed that Mr. Spriggs' testimony would have offered an alternative scenario that featured Boomer in the role of the shooter instead of an onlooker. Mr. Patterson argued that this testimony would have raised a reasonable doubt of his guilt.
Based on the evidence that was presented and proffered at the evidentiary hearing, Mr. Patterson argued that if Mr. Spriggs had been called as a witness at trial, he would have been able to testify to the following facts: Mr. Spriggs had been present at Mr. Dunn's residence earlier during the day of August 7. Mr. Spriggs was aware that Mr. Dunn and many of the people who were in and about the residence that day were using alcohol and illegal drugs. Based on conversations he had with several people, Mr. Spriggs was also aware that Mr. Dunn and Boomer had had a disagreement about the debt that Boomer owed Mr. Dunn for repairs to Boomer's truck. Approximately eight hours before the shooting occurred early on August 8, Mr. Spriggs had seen Boomer in possession of a handgun. Mr. Spriggs had also heard Boomer say that he was going out to Mr. Dunn's residence "to get his truck one way or another." Before Mr. Patterson departed from his own home with Boomer and their two companions to go to Mr. Dunn's residence, Mr. Spriggs took a .22 caliber derringer from Mr. Patterson.[5] Mr. Spriggs remained at Mr. Patterson's home until Mr. Patterson and Boomer returned from their visit to Mr. Dunn's residence. Upon their return, Mr. Spriggs asked Mr. Patterson "what [Mr. Patterson] was doing back at the house." Further, Mr. Spriggs informed Mr. Patterson that Mr. Patterson was being sought in connection with Mr. Dunn's murder. Mr. Patterson responded by denying that he had shot Mr. Dunn and added, "Boomer's the one who shot him." Boomer  who was present during Mr. Spriggs' conversation with Mr. Patterson *476  did not deny Mr. Patterson's accusation that Boomer had shot Mr. Dunn. Instead, Boomer "hung his head and walked off."[6]
C. The Postconviction Court's Order
The postconviction court did not announce its ruling or any findings of fact at the conclusion of the evidentiary hearing. Instead, the postconviction court took the matter under advisement, and it subsequently entered a written order. Stated in their entirety, the postconviction court's findings of fact and conclusions of law that appear in its order are as follows:
The court heard testimony from [Mr. Patterson] and from Mr. Spriggs. Trial counsel Michael Tewell appeared in response to a subpoena but did not testify at the evidentiary hearing. The court also reviewed the court file and carefully read the entire trial transcript. Based on the record and the testimony at the hearing, the court finds that [Mr. Patterson] proved that counsel's performance was deficient in failing to call Mr. Spriggs as a witness at the trial, and that this deficiency prejudiced the defense. Strickland v. Washington, [466 U.S. 668] 104 S.Ct. 2052 [80 L.Ed.2d 674] (1984). There was no evidence presented at the hearing that trial counsel's decision not to call Mr. Spriggs was tactical. Further, there is a reasonable probability that had Mr. Spriggs been called as a witness, the verdict might have been different.
Based on this reasoning, the postconviction court awarded Mr. Patterson a new trial. The State appeals this order.

III. THE TEST FOR ESTABLISHING AN INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIM
The test for establishing an ineffective-assistance-of-counsel claim is a two-pronged one:
(1) The claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards.
(2) The clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). To establish the second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

IV. THE STANDARD OF REVIEW
A trial court's ruling on a motion for postconviction relief based on a claim of ineffective assistance of counsel presents a mixed question of fact and law. This factor determines our standard of review of a trial court's order on such a motion:
An appellate court reviews the denial of a motion for postconviction relief alleging ineffective assistance of counsel *477 as a mixed question of fact and law. While affording great deference to the trial court's factual findings, the court conducts an independent review of the legal conclusions flowing from those findings. As stated in Stephens v. State, 748 So.2d 1028 (Fla.1999), "under Strickland, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's factual findings." Id. at 1033 (citing Strickland, 466 U.S. at 698, 104 S.Ct. 2052).
Lee v. State, 899 So.2d 348, 352 (Fla. 2d DCA 2005). These principles are applicable equally where  as in this case  the trial court grants a motion for postconviction relief alleging ineffective assistance of counsel. Unfortunately, the postconviction court's findings of fact in this case are unsupported by any analysis of the evidence at trial or by the testimony of Mr. Patterson and Mr. Spriggs at the hearing. Consequently, we give these conclusory findings minimal deference.

V. DISCUSSION
A. The Deficient Performance Prong
(1) The trial court's focus on the absence of testimony by trial counsel
The postconviction court noted in its order that "no evidence [was] presented at the hearing that trial counsel's decision not to call Mr. Spriggs was tactical." We take issue with this statement for two reasons. First, the statement reflects the postconviction court's implied but erroneous assumption that Mr. Patterson's testimony at the hearing assailing Mr. Tewell's performance as ineffective must be taken as true because the State did not call Mr. Tewell in rebuttal. Second, the statement ignores the hearing testimony from both Mr. Patterson and Mr. Spriggs demonstrating that Mr. Tewell had several excellent reasons for not calling Mr. Spriggs as a witness at Mr. Patterson's trial. We will consider each of these areas of our disagreement with the postconviction court's statement.
(2) The strong presumption of reasonable performance
Under Strickland, the defendant bears the burden of overcoming a strong presumption of counsel's reasonable performance. Cabrera v. State, 766 So.2d 1131, 1133 (Fla. 2d DCA 2000) ("There is a strong presumption of reasonableness that must be overcome, and strategic or tactical decisions by counsel made after a thorough investigation are `virtually unchallengeable.'" (citing Downs v. State, 453 So.2d 1102, 1108 (Fla.1984))). A defendant does not overcome this burden by default merely because the State either cannot or does not provide specific evidence that trial counsel's actions under review were based on strategic or tactical considerations.
In State v. Chattin, 877 So.2d 747, 749 (Fla. 2d DCA 2004), this court considered a similar situation where "[defense] counsel could not remember the case" and the trial court found that "the State had not presented any evidence to show [that] counsel's actions were tactical." Although the Chattin court found it unnecessary to decide the deficient performance prong of Strickland, it noted that "[t]he trial court erred as a matter of law in improperly shifting to the State the burden to prove that Chattin's counsel's actions were a product of reasonable trial strategy." Id. at 749 n. 2 (emphasis added). Therefore, although Mr. Tewell's testimony might have been helpful to the court, the fact remains that Mr. Patterson had first to overcome the strong presumption of trial counsel's reasonable performance before the State was required to present any evidence on the issue.
*478 (3) The evidence at the hearing substantiating reasonable performance
This brings us to our second area of disagreement with the postconviction court's statement that is quoted above. In fact, abundant evidence of tactical or strategic reasons not to call Mr. Spriggs as a trial witness appears in Mr. Patterson's hearing testimony about his conversations with Mr. Tewell before and during the 1998 trial:
Q [Postconviction counsel] Did you ever have a conversation with your attorney regarding Richard Spriggs?
A [Mr. Patterson] [My attorney] tried to say that I didn't need [Mr. Spriggs as a witness] and I told him that I wanted [Mr. Spriggs]. Yes.
Q When did this conversation occur regarding that you wanted him? Was it during your trial, before your trial? When was it?
A Actually, I think we had one before the trial and [one] during the trial.
Q In the conversation during the trial, did [your attorney] tell you why he felt that [Mr. Spriggs] wasn't needed?
A He said that [Mr. Spriggs] had told the State [Attorney] that I had confessed to [Mr. Spriggs].
Q That [Mr. Spriggs] had told the State Attorney that?
A Yes, sir.
Q And that would be used against [Mr. Spriggs as a] witness?
A Yes, sir.
Q Did he mention any prior record that [Mr. Spriggs] could be attacked on credibility, in terms of prior record?
A There's drugs. He said it was because of [Mr. Spriggs'] drugs. He said he was into drugs  had drug charges.
Moreover, the trial transcript corroborates Mr. Patterson's hearing testimony about what Mr. Tewell said concerning Mr. Spriggs' conversation with the "State Attorney." Before trial, Mr. Tewell anticipated that Mr. Spriggs might testify for the State. During a series of motions heard immediately before Mr. Patterson's trial began, Mr. Tewell represented to the trial court that Mr. Spriggs is "going to claim that once upon a time my client said he shot Jimmy Dunn. And this is after he said  after  according to Mr. Spriggs, . . . Tommy Patterson said a number of times that it was Boomer who did it." (Emphasis added.) Ultimately, the State did not call Mr. Spriggs to testify at Mr. Patterson's trial.
In addition, Mr. Spriggs himself offered probative testimony at the evidentiary hearing about Mr. Tewell's decision not to call Mr. Spriggs as a witness at trial:
Q [Postconviction counsel] Did you discuss with Mr. Tewell the facts of the case  where you feel that you could testify?
A [Mr. Spriggs] Yes, sir.
Q All right. Did he ever indicate to you whether or not you would be called?
A He told me I wouldn't be called because of my differences with [the assistant state attorney] in prior cases and some other cases that was [sic] pending against me with the FDLE.
Q Those were allegations regarding a homicide; is that right?
A Yes, sir.
Q Were you ever charged in the homicide?
A Never. Never even questioned.
Thus, according to Mr. Patterson, Mr. Tewell declined to call Mr. Spriggs as a trial witness because Mr. Spriggs was a drug user with a criminal record who had previously informed the prosecutor that *479 Mr. Patterson had confessed to the murder of Mr. Dunn. The trial transcript confirms that this was Mr. Tewell's understanding of what Mr. Spriggs might say at trial. Mr. Spriggs himself said that Mr. Tewell's decision not to call him as a witness stemmed from a pending investigation into Mr. Spriggs' suspected involvement in an unrelated murder. Whether or not Mr. Spriggs was ultimately charged with that crime, the pendency of such an investigation would have given Mr. Spriggs a strong incentive to testify for the State against Mr. Patterson either to escape prosecution or to obtain leniency in the unrelated matter. In their testimony at the evidentiary hearing, neither Mr. Patterson nor Mr. Spriggs disputed the facts underpinning Mr. Tewell's stated reasons for deciding not to call Mr. Spriggs as a witness.[7] Thus the evidence presented at the hearing does not support the postconviction court's finding that "no evidence [was] presented at the hearing that trial counsel's decision not to call Mr. Spriggs was tactical."
(4) Defense counsel's perspective at the time of trial
Mr. Patterson does not claim that Mr. Tewell failed to interview Mr. Spriggs prior to trial. In fact, Mr. Tewell took Mr. Spriggs' pretrial deposition.[8] When the deposition was taken, Mr. Spriggs was being housed in the Pasco County Detention Center on a pending murder charge. At the time, Mr. Spriggs was charged with sale and possession of methamphetamine, failure to appear, driving while his license was suspended, and having an improper license tag. He was also under investigation in connection with two other murders. In addition, Mr. Spriggs admitted to having multiple felony convictions.
On numerous occasions during his deposition, Mr. Spriggs either asserted his Fifth Amendment right to refuse to answer questions that might incriminate him or declined to answer questions that he deemed irrelevant to the case against Mr. Patterson for the murder of Mr. Dunn. A telling exchange took place when Mr. Tewell asked Mr. Spriggs about the prospect of his testimony at Mr. Patterson's trial:
Q [Mr. Tewell] All right. Did Detective Medley tell you that [the assistant state attorney] would want you to testify in the Patterson case?
A [Mr. Spriggs] Yes, sir.
Q Did you ask Detective Medley what [the assistant state attorney] was going to offer you in exchange for your testimony in the Patterson case?
A Yes, sir.
Q What did Medley tell you in response?
A He said he wouldn't  he probably wouldn't give me nothing.
Q What did you tell him?
A Told him I wasn't going to do it then.
Q Why not?
A Why should I?
Q I asked you why not.
A Ain't 
Q What would you want in exchange for your testimony?
A This case off of me.

*480 Q Which case is that?
A This methamphetamines that I haven't sold. I didn't sell it.
Thus, prior to trial, a detective had approached Mr. Spriggs about testifying as a witness for the State. However, Mr. Spriggs had refused to testify unless the pending drug charges against him were dismissed.
With this background in mind, we turn to the question of whether Mr. Tewell provided reasonably competent representation to Mr. Patterson in November 1998 when Mr. Tewell chose not to call Mr. Spriggs as a witness at trial. Here, we find guidance in this court's decision in Lee:
An examination of counsel's performance begins with a strong presumption that it is reasonable and is considered from the attorney's perspective under the circumstances at the time of trial. Downs v. State, 453 So.2d 1102, 1106 (Fla.1984). However, to make valid strategic or tactical decisions, an attorney "has a duty to make reasonable investigations or to make a reasonable decision that particular investigations are unnecessary." Light v. State, 796 So.2d 610, 616 (Fla. 2d DCA 2001) (citing Strickland, 466 U.S. at 691, 104 S.Ct. 2052).
899 So.2d at 352 (emphasis added). Thus the focus of our inquiry must be on the circumstances as they appeared to Mr. Tewell at the time of trial rather than viewed in hindsight.
Based on Mr. Spriggs' deposition testimony, Mr. Tewell would certainly have recognized that Mr. Spriggs was unlikely to be a credible witness. Mr. Spriggs was a drug-user with multiple felony convictions who was currently facing drug and murder charges. The State had approached Mr. Spriggs about the possibility of having him testify at Mr. Patterson's trial, but Mr. Spriggs was demanding leniency on the pending drug charges in return for his testimony. It is true that Mr. Spriggs did not claim in his deposition that Mr. Patterson had admitted killing Mr. Dunn. But Mr. Patterson's testimony at the evidentiary hearing and Mr. Tewell's representations to the court immediately before the trial began strongly suggest that Mr. Tewell had learned from another source that Mr. Spriggs had made such a claim to a representative of the State Attorney's office.
Our review of Mr. Spriggs' pretrial deposition reveals that Mr. Tewell would reasonably have concluded that Mr. Spriggs' testimony would have been of little assistance to the defense  certainly not enough to overcome his credibility issues and to warrant taking the risk that he might testify that Mr. Patterson had admitted killing Mr. Dunn. Mr. Spriggs was not present at the scene of the shooting early on the morning of August 8, 1998. Mr. Spriggs last saw both Mr. Patterson and Boomer before they went to Mr. Dunn's residence, and he did not see them again until later the next morning. Mr. Spriggs did have personal knowledge of the dispute between Mr. Dunn and Boomer over the debt for the truck repairs, and he had heard Boomer say that "he was going to come back and get the truck one way or the other." But Mr. Tewell's opening statement at Mr. Patterson's trial demonstrated his expectation that several State witnesses would testify concerning Boomer's quarrel with Mr. Dunn about the truck. In fact, at least four State witnesses gave such testimony.
Moreover, Mr. Spriggs did not testify in his 1998 deposition that he saw either Mr. Patterson or Boomer with a firearm before they left Mr. Patterson's residence (where Mr. Spriggs remained) early on the morning that Mr. Dunn was killed. Mr. Spriggs claimed that he next saw Mr. Patterson *481 at 10:30 or 11 a.m. the next morning. According to Mr. Spriggs' deposition testimony, when he told Mr. Patterson that Mr. Dunn was dead, Mr. Patterson responded, "I ain't did that, Dog." Mr. Tewell explored this response with additional questions:
Q [Mr. Tewell] All right. Did [Mr. Patterson] tell you what happened?
A [Mr. Spriggs] He told me thathe said, "I didn'tI didn't do this. BoomerBoomer did it." That's the very words he told me.
Q Did he describe
A He said that he had been arguing with [Mr. Dunn] about the deal.
. . . .
Him [sic] and [Mr. Dunn] had been arguing about this snitch issue, and they had ironed out their grievances, and he turned around to walk away, and Boomer grabbed the gun from him, and he walked on to the car. And as he got to the car and lit a cigarette, he said he turned back around and Boomer shot [Mr. Dunn]. [Mr. Patterson] turned around and he . . . heard the three shots.
Although Mr. Spriggs indicated that Boomer was in the general vicinity when this conversation with Mr. Patterson occurred, Mr. Spriggs' pretrial deposition testimony does not indicate whether Boomer had actually heard the conversation. Significantly, Mr. Spriggs did not say whether Boomer had any reaction to Mr. Patterson's statement: "I didn'tI didn't do this. BoomerBoomer did it."
In evaluating Mr. Spriggs' deposition testimony before trial, Mr. Tewell would likely have concluded that most of Mr. Spriggs' deposition testimony about the disagreements among Mr. Dunn's circle of acquaintances was not only inadmissible hearsay but was also cumulative to other witnesses' testimony. Furthermore, Mr. Tewell would very likely have recognized that Mr. Spriggs' account of Mr. Patterson's morning-after version of how Mr. Dunn was killed constituted inadmissible hearsay. Mr. Spriggs' testimony about Mr. Patterson's out-of-court statement denying guilt and naming Boomer as the shooter would not have been admissible as substantive evidence under a hearsay exceptionan admission under section 90.803(18), Florida Statutes (Supp.1998) because it would not have been offered against Mr. Patterson at trial. See Lott v. State, 695 So.2d 1239, 1242-43 (Fla.1997); Cotton v. State, 763 So.2d 437, 439 (Fla. 4th DCA 2000); Charles W. Ehrhardt, Florida Evidence § 801.3 (2006 ed.).
To summarize, Mr. Spriggs was a "loose cannon." He had made conflicting statements, and he had major credibility problems. Adding to Mr. Spriggs' unsuitability as a witness was his disinclination to testify without a promise of some benefit for taking the witness stand. Under these circumstances, it is not surprising that neither the State nor the defense called Mr. Spriggs as a witness at trial. Furthermore, Mr. Spriggs' deposition demonstrated that any testimony he could have offered that would have been admissible at trial could have assisted the defense on only two points: (1) Mr. Spriggs had personal knowledge of the quarrel that Boomer had with Mr. Dunn and (2) Mr. Spriggs had personal knowledge that on August 7, Mr. Dunn and many of the people who were in and about his residence were using alcohol and illegal drugs. However, both of these points were established at trial by the testimony of several other witnesses.
For all of these reasons, we conclude that Mr. Patterson failed to overcome the strong presumption that Mr. Tewell acted reasonably in deciding not to call Mr. Spriggs as a witness at trial. The testimony given by Mr. Patterson and Mr. Spriggs at the evidentiary hearing, Mr. Tewell's representations to the court at the *482 beginning of the trial, and Mr. Spriggs' pretrial deposition all support the conclusion that Mr. Tewell's decision to forego calling Mr. Spriggs as a defense witness was a reasonable trial strategy. Indeed, it is fair to say that a decision by Mr. Tewell to call Mr. Spriggs as a witness at trial would have been both ill-advised and reckless.
B. The Prejudice Prong
Although an analysis of the prejudice prong under Strickland is unnecessary whenas herethe defendant has failed to establish deficient performance, we are unable to discern any prejudice resulting from Mr. Tewell's decision not to call Mr. Spriggs as a witness at trial. We begin by noting the obviousMr. Patterson's claim was for the alleged ineffective assistance of trial counsel, not a claim of newly discovered evidence. Thus the proper subjects of the inquiry on the reasonableness of Mr. Tewell's decision not to call Mr. Spriggs as a witness at trial should have been what Mr. Tewell knew before trial about what Mr. Spriggs could say concerning the facts of the case, Mr. Spriggs' credibility as a witness, and the testimony that might be anticipated from other prospective witnesses. Instead, Mr. Spriggs was permitted to testify at the hearing about entirely new matters that he had not mentioned in his deposition six years earlier. At the hearing, Mr. Spriggs testified for the first time that he had seen Boomer with a small, silver handgun on the night preceding the early-morning murder. Mr. Spriggs also claimedagain for the first timethat before Boomer and Mr. Patterson departed for Mr. Dunn's residence, he saw Boomer put the small, silver handgun in his pocket. In addition, Mr. Spriggs testified that he asked Mr. Patterson to leave a second gunMr. Patterson's .22 caliber derringerwith him. Mr. Patterson acquiesced, and Mr. Spriggs took the derringer. According to Mr. Spriggs' testimony at the hearing, Mr. Patterson left his gun with Mr. Spriggs because Mr. Spriggs was "watching" Mr. Patterson's house for him.[9]
The most controversial subject of Mr. Spriggs' hearing testimony centered on the conversation that he said he had conducted with Mr. Patterson in Boomer's presence later that morning, after Mr. Dunn had been shot. The State objected to this testimony as hearsay, and the post-conviction court sustained the objection. Mr. Patterson's counsel proffered that Mr. Spriggs would testify that when Mr. Patterson denied being the shooter and instead accused Boomer, "Boomer was sitting there, hung his head and walked off. Did not deny it." Mr. Patterson's counsel argued that this testimony would have been admissible to impeach Boomer's credibility because Boomer had testified at trial.[10] The State responded that Mr. Spriggs' testimony on this point was inadmissible hearsay and that Boomer's testimony was "not the only thing that tie[d] Mr. Patterson to this murder." The post-conviction court appeared to rule from the bench that Boomer's alleged silence would have been admissible at trial.
*483 The new details about the weapons and Boomer's alleged shamefaced reaction to Mr. Patterson's shifting the blame for Mr. Dunn's death ought not to have been considered in determining the ineffective-assistance-of-counsel claim. Instead, the claim should have been evaluated strictly "considered from the attorney's perspective under the circumstances at the time of trial." Lee, 899 So.2d at 352 (citing Downs v. State, 453 So.2d 1102, 1106 (Fla.1984)). Although the postconviction court did not elaborate on its reasoning, a review of the hearing transcript leads inescapably to the conclusion that the postconviction court relied at least in part on Mr. Spriggs' new disclosures for its conclusion that "there [was] a reasonable probability that had Mr. Spriggs been called as a witness, the verdict might have been different." We have thoroughly reviewed the trial transcript, Mr. Spriggs' pretrial deposition, and the hearing transcript. Discounting Mr. Spriggs' newly told details, we conclude that most of his testimony would have been either inadmissible or duplicative. It fell far short of demonstrating a reasonable probability that, but for omitting to call Mr. Spriggs, the result of the trial would have been different.
Nonetheless, we may take the analysis one step further and posit that Mr. Tewell could have used Mr. Spriggs' testimony to effectively impeach Boomer based on Boomer's alleged silence in the face of an accusation that he was the shooter.[11] Assuming that Mr. Spriggs' testimony would have caused the jury to disregard Boomer's eyewitness account of the shooting, the State still proved the following critical facts through other witnesses: (1) when the shooting occurred, Mr. Patterson had been on a methamphetamine binge for several days; (2) Mr. Patterson was quick to anger when he was using methamphetamine; (3) Mr. Patterson was angry at Mr. Dunn because of the alleged snitch accusation; (4) before going to Mr. Dunn's residence with Boomer, Mr. Patterson had announced his intention to harm Mr. Dunn; (5) Mr. Patterson had a gun in his hand and fired it at the scene of the killing; (6) immediately after the incident at Mr. Dunn's residence, Mr. Patterson admitted to two other witnesses that he had shot Mr. Dunn; and (7) the bullets that were removed from Mr. Dunn's body were fired from the pistol that Mr. Patterson had discharged at the scene. In other words, even if Boomer's eyewitness account had been discredited, the testimony from other State witnessesparticularly Mr. Strickland and Ms. Giffordwould still have provided ample support for the jury's verdict. Under these circumstances, we conclude that the omission of Mr. Spriggs' testimony could not have so affected the fairness and reliability of Mr. Patterson's trial that confidence in the jury's verdict is undermined.

VI. CONCLUSION
For these reasons, Mr. Patterson failed to establish either prong of Strickland's test for ineffective assistance of counsel. The postconviction court erred in granting Mr. Patterson's motion and awarding him a new trial. Accordingly, we reverse the postconviction court's order, and we remand this case with directions to reinstate Mr. Patterson's judgment and sentence for second-degree murder.
Reversed and remanded with directions.
WHATLEY and DAVIS, JJ., Concur.
NOTES
[1] In fact, an autopsy revealed that Mr. Dunn had been shot three times, once in each leg and once in the left side of his chest. The leg wounds were not life-threatening. However, the bullet wound to Mr. Dunn's chest caused massive internal bleeding that resulted in his death.
[2] A third bullet passed through Mr. Dunn's right leg below the knee. This bullet was not recovered.
[3] The testimony of the three other defense witnesses is not pertinent to our discussion of the evidence that was presented at Mr. Patterson's trial.
[4] Both postconviction counsel for Mr. Patterson and the assistant state attorney acknowledged in their closing arguments at the hearing the relevance of Mr. Tewell's rationale for not presenting Mr. Spriggs' testimony at trial. Nevertheless, neither of these attorneys identified any reason why Mr. Tewell was not called as a witness at the evidentiary hearing.
[5] Mr. Dunn was shot with a .380 caliber, semi-automatic pistol, not a .22 caliber derringer.
[6] This account of Mr. Spriggs' encounter with Mr. Patterson and Boomer after the shooting is based on a proffer made by Mr. Patterson's counsel at the hearing. The postconviction court sustained the State's objections to testimony by Mr. Spriggs concerning the postshooting encounter.
[7] Mr. Spriggs testified at the evidentiary hearing that he had never told Mr. Tewell or any representative of the Public Defender's office that Mr. Patterson had confessed to shooting Mr. Dunn. He did not deny that he had made such a statement to representatives of the State Attorney's office.
[8] Both the deposition transcript and the trial transcript were available to the postconviction court at the hearing on Mr. Patterson's motion.
[9] Since the State did not contend that Mr. Dunn had been shot with a .22 caliber pistol, it is difficult to see the relevance of testimony about Mr. Patterson's surrender of such a weapon to Mr. Spriggs. Perhaps the defense's point was that Mr. Patterson had been willing to face Mr. Dunn unarmed.
[10] See McBean v. State, 688 So.2d 383, 384 (Fla. 4th DCA 1997) ("It is well settled that a witness may be impeached by a prior inconsistent statement, including an omission in a previous out-of-court statement about which the witness testifies at trial, if it is material and would naturally have been mentioned." (citing § 90.608(1), Fla. Stat. (1995), and State v. Smith, 573 So.2d 306, 313 (Fla. 1990))).
[11] For the purpose of our analysis, we need not decide whether this would have constituted proper impeachment under section 90.608(1), Florida Statutes (1997).